

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JACKLYN WORFEL MAYFIELD AND LORI BETH MAYFIELD, | § | No. 08-13-00100-CV |
| | § | |
| Appellants, | | Appeal from the |
| | § | |
| v. | | 67th District Court |
| | § | |
| TARRANT REGIONAL WATER DISTRICT, | § | of Tarrant County, Texas |
| | § | (TC#067-260763-12) |
| Appellee. | § | |

## O P I N I O N

Appellants/plaintiffs Jacklyn Worfel Mayfield and Lori Beth Mayfield[1] appeal the granting of Appellee/defendant Tarrant Regional Water District's plea to the jurisdiction. We affirm.

## FACTS

Plaintiffs filed a suit under the Texas Commission on Human Rights Act for gender discrimination and retaliation against their former employer, Tarrant Regional Water District. The water district filed a plea to the jurisdiction, urging that the plaintiffs' petition did not make claims sufficient to overcome the district's sovereign immunity. The trial court granted the plea

---

[1] Jacklyn is referred to throughout plaintiffs' brief as Nikki. Because plaintiffs have the same surname, we will refer to them as Jacklyn and Lori.

and dismissed the entire lawsuit with prejudice on December 18, 2012. This interlocutory appeal follows.

Jacklyn Worfel Mayfield was employed by Tarrant Regional Water District as an administrative assistant for less than a year. She was initially hired as an administrative assistant in the engineering department, and two months later she was moved to the risk management department. She had an office in both the engineering department and IT department so she could work on projects in both. She was supervised by Madeline Robson, IT director, Norman Ashton, risk manager, and Jennifer Poulson, her direct supervisor. Her mother-in-law, Lori Beth Mayfield, was employed by the water district for twenty years, and at the time of her termination was an engineering coordinator. Lori supervised Jacklyn's project in the engineering department. They were both terminated on March 21, 2012.

During the week of December 19, 2011, Jacklyn was called into an office where several people were laughing and talking, including her supervisors Norman Ashton, Madeline Robson, and Jennifer Poulson. They told her "you have to see this, come look now." Jacklyn did so, and was shown a photograph on Ashton's phone of "an extremely hairy and huge penis." Jacklyn was shocked and horrified, reacted negatively, and was told to leave the room. Jacklyn wanted to report this incident, but as all her supervisors had been participants, she reported it to her engineering department supervisor (and mother-in-law) Lori, who recommended that she not report the incident further and hope it would blow over with time. Lori advised Jacklyn it would "go badly" for her if she reported the incident further. Following the penis picture incident, Jacklyn "experience[d] increased tension in the office." Her petition and supporting affidavit detail a number of interactions between her supervisors and herself, mainly consisting of challenges to her truthfulness about medical appointments and treatment. She felt that Ashton

2

watched her constantly. She was told to get verification of tests her doctor performed to show she was not lying about treatment. She was told to give her supervisor Poulson detailed reports about her whereabouts when she was away from her desk. Supervisor Ashton apparently thought this reporting was disrespectful to Poulson (why he felt this way was unexplained). No other employee was required to give these detailed reports. Jacklyn again consulted with Lori, who again advised her to comply with the requests and see if the problem would resolve on its own.

Jacklyn asserts that this poor treatment caused stress, which in turn caused her health to worsen, with headaches, "pressure in [her] head," and fatigue. Eventually, she was moved back to the engineering department under the supervision of Aisha Hakimi. During this time, she had a spinal tap performed in an emergency room, after which she had to lay flat for three days. She returned to the hospital from February 27 to March 2, 2012, and asserts that she kept her engineering supervisor, Hakimi, informed about her whereabouts. She elected to take leave without pay for this time. Nevertheless, Jacklyn was required to bring in paperwork proving her dates of hospitalization, which was not immediately available. The gist of Jacklyn's interactions regarding her medical treatment was that her employers thought she was "a cheater" and was just going for medical tests because she wanted to. She returned to work on March 8, 2012 with copies of the requested paperwork, including all her prescribed medication. She was told to report to Poulson each day she was out ill, and report her arrival and departure times from work as well. She returned to the hospital on March 13 with a diagnosis of a strep infection, which she reported to Poulson. Ashton called her in her hospital room on March 14 regarding a medical power of attorney. Jacklyn declined to make any decisions about a power of attorney at that time. She sought assistance from the hospital's patient advocate, who requested the water

3

district's leave policy. The leave policy supplied by the district to Jacklyn was different than that posted on its employee intranet.

Jacklyn was eventually diagnosed with, and received treatment for, a cortisol deficiency. She was released from the hospital and was informed on March 21, 2012 that she had been terminated as she had exhausted her paid time off. She claims that this was pursuant to a "new" policy that "[i]f any employee has depleted all eligible leave and does not return to work, his/her employment will be terminated unless prior arrangement has been made with their Supervisor and has been approved by the Human Resources department." The letter also stated that Jacklyn was dismissed for failing to make prior arrangements with her supervisor. Jacklyn and Lori were told that Robson and Ashton had obtained permission from the water district's general manager to fire Jacklyn, telling him that she had failed to notify her supervisor of every day of her hospitalization.

Upon learning of Jacklyn's termination, Lori told her own supervisor that she had personally supervised Jacklyn's notification regarding her hospitalization, and Jacklyn had proof she had contacted a supervisor daily. She told him that the water district "had broken her heart and that her heart would never be with this company again." Lori was also terminated from the water district, and was never given a reason as to why, even when inquiry was made for purposes of obtaining unemployment insurance.

Both plaintiffs filed charges of discrimination and retaliation, for which they eventually received right-to-sue letters. They sued the water district, which raised sovereign immunity in its plea to the jurisdiction. The trial court granted the water district's plea to the jurisdiction. This appeal follows.

**STANDARD OF REVIEW**

4

A plea to the jurisdiction based on governmental immunity challenges a trial court's subject matter jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225-26 (Tex. 2004). Whether a trial court has subject matter jurisdiction is a question of law subject to *de novo* review on appeal. *Id.* at 226, 228. In determining whether the plaintiffs have carried their burden to allege facts sufficient to establish subject matter jurisdiction, we review the allegations in the pleadings—accepting them as true and construing them in the plaintiff's favor—and any evidence relevant to the inquiry. *Id.* at 226-27. If the evidence raises a fact question on jurisdiction, the plea must be denied. *Id.* at 227-28.

## DISCUSSION

In two issues for review, plaintiffs urge that (1) their pleadings were sufficient to defeat a plea to the jurisdiction for employment discrimination and retaliation; and (2) they were denied the right to replead their claims before dismissal of their case. We address these claims in turn.

### *Jurisdiction over Discrimination Cause of Action*

Under the Texas Commission on Human Rights Act (TCHRA) "[a]n employer commits an unlawful employment practice if because of … sex … the employer … discharges an individual or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment …." TEX.LAB.CODE ANN. § 21.051 (West 2015); *Mission Consolidated I.S.D. v. Garcia,* 253 S.W.3d 653 (Tex. 2008). The legislature has waived governmental immunity for claims brought under the TCHRA provided the plaintiffs plead the prima facie elements of their claims. Therefore, to defeat this plea to the jurisdiction, plaintiffs must show that a fact question exists as to the merits of their case. *University of Texas at Arlington v. Williams,* 455 S.W.3d 640, 644 (Tex.App.—Fort Worth 2013), *aff'd*, 2015 WL 1285317 (Tex. March 20, 2015). When a jurisdictional challenge

5

implicates the merits of the plaintiffs' claims, the trial court considers the evidence submitted by the parties to determine if a fact question exists. If the submitted evidence creates a fact question, then a trial court cannot grant the plea to the jurisdiction. If the evidence is undisputed, or if the evidence does not raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 644.

Sexual harassment is a recognized category of sex discrimination under the TCHRA. *Soto v. El Paso Natural Gas Co.,* 942 S.W.2d 671, 677 (Tex.App.—El Paso 1997, writ denied). Initially, we point out that only Jacklyn relies upon sex discrimination in employment as a cause of action; Lori's lawsuit is based solely upon a retaliation theory. Generally, the courts recognize two alternative ways of establishing discriminatory treatment: (1) bringing forth direct evidence of discriminatory intent via what defendant or its agents did and said; or (2) the burden-shifting mechanism of *McDonnell Douglas v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff Jacklyn here relies upon the direct method of proving discriminatory animus. Specifically, she argues that she established a case of sex discrimination through sexual harassment through both hostile work environment and *quid pro quo* theories.

We may dispose of the *quid pro quo* argument quickly. To establish a prima facie case for *quid pro quo* sexual harassment, a plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual advances or requests for sexual favors by someone with actual or apparent authority; (3) the harassment was based on sex; and (4) submission to the unwelcome advances was an express or implied condition for receiving job benefits or refusal to submit resulted in a tangible job detriment. *Soto,* 942 S.W.2d at 677-78. Jacklyn claims that the "penis picture" incident and detrimental treatment that followed are sufficient to create a fact question on *quid pro quo*. We disagree. Although displaying pictures

6

of genitalia in the workplace is certainly not professional behavior, and we in no way condone it, we simply cannot see that this constituted a sexual advance or request for sexual favors. It was an isolated incident, took place in a room full of people both male and female, and when Jacklyn reacted to it negatively she was excused. Even coupled with the treatment that followed (reporting her whereabouts, demanding doctor's verification of absences, and ultimate termination) we do not believe this makes out a cause of action for *quid pro quo* sexual harassment. The trial court did not err in granting the plea to the jurisdiction on this theory.

We next turn to the hostile environment theory of sex discrimination. To make a prima facie showing of hostile environment sexual harassment, a plaintiff must meet the following elements: (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Id.* at 678. If the harassment was by plaintiff's supervisor, some courts do not require a showing as to the fifth element. *Nairn v. Killeen I.S.D.,* 366 S.W.3d 229, 245 (Tex.App.—El Paso 2012, no pet.); *City of San Antonio v. Cancel,* 261 S.W.3d 778, 784 n.2 (Tex.App.—Amarillo 2008, pet. denied).

"For conduct to be actionable, a plaintiff must show 'the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile or abusive working environment.'" *Spring v. Walthall,* No. 04-09-00474-CV, 2010 WL 2102988, at *5 (Tex.App.—San Antonio May 26, 2010, no pet.) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). Sexual harassment is sufficiently severe or pervasive to alter the terms, conditions, or privileges of the victim's employment when it can be said to create an

7

abusive working environment. Abusiveness requires extreme conduct, and takes a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Walthall*, 2010 WL 2102988, at *6.* The conduct must be both objectively and subjectively hostile or abusive. *Walthall*, 2010 WL 2102988, at *6.* That is, the work environment must be both one that a reasonable person would find hostile or abusive and one that the victim in fact perceived to be so. *City of Houston v. Fletcher,* 166 S.W.3d 479, 489 (Tex.App.—Eastland 2005, pet. denied). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is not actionable. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. In assessing objective hostility or abusiveness, the discriminatory conduct is viewed from the perspective of a reasonable person in the plaintiff's position in the same circumstances. *Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). We consider the totality of the circumstances including frequency, severity, physical threats or humiliation, and whether the abusive conduct unreasonably interfered with the employee's work performance. *Harris* 510 U.S. at 23, 114 S.Ct. at 371.

In support of her hostile environment claim, Jacklyn points to the following: (1) the penis picture incident; (2) following her negative reaction to the penis picture, the monitoring of her whereabouts; (3) placing reporting requirements on her not placed on other employees; (4) accusations of disrespect when she complied with the reporting requirements; (5) accusations of lying about doctors appointments and hospitalizations and requiring unreasonable documentation; (6) calling her at the hospital and demanding to talk with her doctor; and (7)

Robson and Ashton getting permission to terminate her from the general manager, although they were no longer supervising her.

In assessing this evidence, we may review other cases in which rude and undesirable behavior was deemed insufficient as a matter of law to meet the objective standard of abusiveness set out above. In one case, the male president and general manager of a mortgage company stared at and made comments on the female employee's breasts, touched his genitals, frankly discussed highly personal and sexual matters with her, remarked on her appearance, stared at and commented on the photograph of a female client, commented on the appearance of other women, made repeated sexual references which she felt were intended to arouse her, and insulted and yelled at her. The employee was later fired for incompetence. The appellate court found this was insufficient to create a hostile work environment. *Garcia v. Schwab,* 967 S.W.2d 883, 884, 887 (Tex.App.—Corpus Christi 1998, no pet.). In another case, one male supervisor made sexually inappropriate remarks to female employee such as "I'll bet you like it big" whenever she used the work "big" in conversation, made comments about her breast size, referred to other employees as her "lover," stood over her desk and attempted to look down her shirt, and came toward her in a menacing manner as if to grab her sexually. Another male supervisor repeatedly stated he would like to go out and have a drink with the female employee and forbade her from dating another employee. The employee never complained to a higher level of management or called the company's anonymous CareLine. This failed to create a fact question as to hostile work environment. *Staller v. Service Corp. Int'l,* 2006 WL 3018039, at *5-6 (Tex.App.—San Antonio Oct. 25, 2006, no pet.).

We conclude that the facts set out by Jacklyn fall far below the objective standard that was unmet in *Garcia* and *Staller.* She describes a single incident of arguable sexual harassment,

9

which took place in mixed company, and from which she was immediately excused when she took offense. She then relates a series of work requirements that, seen in the light most favorable to her, were contradictory and oppressive, but did not implicate sex, nor did they so permeate the workplace with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create a hostile or abusive working environment.

For these reasons, we find the trial court did not err in sustaining the plea to the jurisdiction with regard to Jacklyn's discrimination claims.

*Jurisdiction over Retaliation Cause of Action*

Both Jacklyn and Lori Mayfield asserted claims for retaliation under the TCHRA, which the trial court dismissed pursuant to the plea to the jurisdiction. To establish a prima facie case for retaliation, plaintiffs must show: (1) they engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal connection between the protected activity and the adverse employment action as to each of them. *Herbert v. City of Forest Hill,* 189 S.W.3d 369, 376 (Tex.App.—Fort Worth 2006, no pet.). The TCHRA lists protected activities as: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; and (4) testifying, assisting, or participating in any manner in an investigation, proceeding or hearing. TEX.LAB.CODE ANN. § 21.055 (West 2015). Termination is an adverse employment action. *Winters v. Chubb & Son, Inc.,* 132 S.W.3d 568, 575 (Tex.App.—Houston [14th Dist. 2004, no pet.). We therefore examine whether there is any fact issue as to whether the plaintiffs engaged in protected activity, and whether their respective terminations might be causally connected to such protected activity.

We first examine Lori's retaliation claim. Even viewed in the light most favorable to plaintiff, we see no protected activity in which Lori engaged. When Jacklyn told her about the penis picture incident, Lori counseled her not to report the incident further and hope it would blow over with time. Lori advised Jacklyn it would "go badly" for her if she reported the incident further. She did not report the incident, in fact quite the opposite. She did discuss what she perceived as Jacklyn's unfair treatment with her own supervisor, but there is no evidence that she linked this up with any allegation of sexual harassment, sex discrimination or any other status protected by the TCHRA. *See County of Travis v. Manion,* No. 03-11-00533-CV, 2012 WL 1839399, at *8 (Tex.App.—Austin May 17, 2012, no pet.). Thus, we cannot say that Lori opposed a discriminatory practice or otherwise engaged in protected activity so as to state a prima facie claim for retaliation.

Similarly, Jacklyn's actions regarding the penis picture incident cannot be said to constitute opposing a discriminatory practice or the making or filing of a claim. Again, she elected *not* to make a complaint upon the advice of her mother-in-law. We do not believe her initial adverse reaction to the picture, without more, can constitute opposition to a discriminatory act, nor the making of a complaint. For these reasons, we believe the trial court correctly granted the plea to the jurisdiction with regard to the retaliation claims of both plaintiffs. Issue One is overruled.

*Right to Amend*

Finally, plaintiffs argue that they should have been given the opportunity to amend their petition prior to the dismissal of their claims. It is true that when a plaintiff fails to plead facts to establish jurisdiction, the issue is one of pleading sufficiency and plaintiffs should be afforded the opportunity to amend. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex. 2002).

11

Where the pleadings and evidence demonstrate that the necessary jurisdictional facts do not exist, and amended pleadings cannot cure the defect, the jurisdictional plea may be ruled upon as a matter of law. *Miranda,* 133 S.W.3d at 227-28. Here, we have reviewed not just the petition in the light most favorable to the plaintiffs' causes of action, we have also taken into consideration their lengthy affidavits setting out the facts of the case. Having done so, we conclude that the facts here simply cannot support a waiver of immunity under the TCHRA. Allowing plaintiffs the chance to amend when they have already marshaled their facts in this manner would simply serve no purpose. The trial court did not err in reaching a similar conclusion. Issue Two is overruled.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's order granting defendant Tarrant Regional Water District's plea to the jurisdiction.

SUSAN LARSEN, Justice (Senior Judge)

June 10, 2015

Before McClure, C.J., Rodriguez, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment